Timothy A. Loranger, Esq. (SBN: 225422)
tloranger@wisnerbaum.com
Pedram Esfandiary, Esq. (SBN: 312569)
pesfandiary@wisnerbaum.com
**WISNER BAUM LLP**
11111 Santa Monica Blvd. Ste. 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

APOSTOLOS PANAYIOTOU, an individual,

Plaintiff,

v.

SYNGENTA AG, a Swiss corporation; SYNGENTA CROP PROTECTION, LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive,

Defendants.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**1. Strict Liability – Design Defect**
**2. Strict Liability – Failure to Warn Outside the Label**
**3. Negligence**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. Plaintiff APOSTOLOS PANAYIOTOU ("Plaintiff") brings this action against Defendants SYNGENTA AG; SYNGENTA CROP PROTECTION, LLC (collectively "Syngenta"); and DOES 1 through 10, inclusive, and alleges as follows.

2. This is a personal injury strict products liability and negligence action against the designers, manufacturers, formulators, registrants, marketers, distributors, and sellers of herbicide products whose active ingredient is atrazine (2-chloro-4-ethylamino-6-isopropylamino-s-triazine), referred to herein as "atrazine-based pesticides" or "ABPs."

3. Atrazine is a manmade chlorinated triazine herbicide and does not occur in nature. It has been among the most heavily applied agricultural chemicals in the United States for more than six decades, and it is the most frequently detected pesticide in American surface water, groundwater, and drinking water.

4. Notably, ABPs are banned across the European Union and are not permitted for general agricultural use in Switzerland, the country in which Defendant Syngenta AG maintains its global headquarters. Syngenta has nonetheless continued to design, manufacture, register, promote, and sell ABPs into the United States market, and into California, in significant volumes and at enormous profit.

5. Plaintiff used ABPs designed, formulated, and distributed by Syngenta. As a direct and proximate result of exposure to Defendants' ABPs, Plaintiff developed the blood cancer non-Hodgkin's lymphoma ("NHL").

6. A substantial and growing body of peer-reviewed scientific studies—including animal studies, epidemiological case-control studies of US applicators, pooled analyses of those studies, molecular-subtype analyses, international pooled cohort analyses, and systematic reviews—reports a causal association between exposure to ABPs and NHL. The cancer-causing potential of ABPs is further

supported by well-characterized biological mechanisms: ABPs are, *inter alia*, immunotoxic, can cause oxidative stress, mitochondrial dysfunction, and DNA damage, all recognized plausible biological mechanisms for cancer generally and NHL specifically.

7. Syngenta has known, or in the exercise of ordinary care should have known, of that evidence. Rather than disclose it, Syngenta engaged in a sustained, well-documented campaign to manipulate, suppress, and discredit the science concerning the health effects of ABPs—including by funding and controlling research, concealing adverse results, deploying purportedly independent scientists and third-party "allies" whose financial relationships with Syngenta were not disclosed, and attacking individual scientists whose findings were unfavorable to Syngenta's product.

8. At no time did Syngenta warn Plaintiff, through the non-label communications described below, that exposure to ABPs was associated with an increased risk of NHL. Those communications included advertisements, oral sales or technical service statements, independent training communications, and/or other non-label communications.

9. The United States Environmental Protection Agency ("EPA") regulates pesticide labeling and certain claims made in connection with pesticide sales and distribution. Plaintiff's warning claims concern communications that did not constitute labeling within the meaning of 7 U.S.C. § 136(p), and that Defendants could have made without changing the EPA-approved labeling. Defendants had the opportunity to disclose the risks through those communications. They chose not to. Had Plaintiff been warned that being exposed to ABPs could cause NHL, he would not have purchased and used ABPs.

10. Plaintiff asserts claims arising exclusively under California law. Plaintiff seeks compensatory damages, exemplary and punitive damages against Syngenta, costs, interest, and such other relief as this Court deems just and proper.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties. Plaintiff is a citizen of California. Syngenta AG is incorporated in Switzerland and has its principal place of business in Switzerland. For purposes of diversity jurisdiction, Syngenta Crop Protection, LLC has the citizenship of each of its members, including through any intervening unincorporated entities. Syngenta Crop Protection LLC's sole member is Syngenta Seeds LLC, another limited liability company. Syngenta Seeds LLC's sole member is Syngenta Corporation, which is incorporated and has its principal place of business in Delaware. Syngenta Crop Protection, LLC is therefore a citizen of Delaware for diversity purposes. In addition, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over Defendant Syngenta Crop Protection, LLC because, at all relevant times, it was registered and authorized to do business in California, maintained a designated agent for service of process in California, maintained facilities, personnel, and sales representatives in California, held California pesticide registrations issued by the California Department of Pesticide Regulation, and continuously and systematically transacted business in California, including in Los Angeles County, from which it derived substantial revenue. Plaintiff's claims arise out of and relate to those contacts, including the distribution and sale in California of the ABPs Plaintiff used in Los Angeles County. Syngenta Crop Protection, LLC's contacts with California are continuous, systematic, purposeful, and substantially connected to Plaintiff's claims. The exercise of jurisdiction over Syngenta Crop Protection, LLC in this action comports with traditional notions of fair play and substantial justice. Moreover, Syngenta Crop Protection, LLC caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or

consumed and services rendered in this judicial district.

13. This Court has personal jurisdiction over Defendant Syngenta AG because, at all relevant times, Syngenta AG purposefully availed itself of the privilege of conducting activities in California and purposefully directed its conduct at the California market. Plaintiff's claims arise out of and relate to those contacts. Specifically, and *inter alia*:

a. Syngenta AG designed, developed, and controlled the formulation and specifications of ABPs, including the ABPs sold and used in California, and directed and approved the global safety and toxicology program for ABPs on which its California registrations and representations rested.

b. Syngenta AG directed, approved, and ratified the strategy by which ABPs were registered with the United States Environmental Protection Agency and with the California Department of Pesticide Regulation for sale and use in California.

c. Syngenta AG directed, approved, funded, and ratified the marketing, advertising, promotional, product-stewardship, and applicator-training content disseminated to end users in the United States, including California.

d. Syngenta AG directed, approved, funded, and ratified the scientific, public-relations, and regulatory-advocacy campaign concerning health effects of ABPs described in this Complaint, which was aimed at end users, regulators, the scientific community, and the public in the United States, including in California.

e. Syngenta AG has, through its United States subsidiaries, affiliates, distributors, and agents, placed ABPs into the stream

of commerce with the expectation and intent that they would be purchased and used by consumers and end users in California, and has derived substantial revenue from California sales of those products.

f. Syngenta AG maintains, directly and through subsidiaries and affiliates, ongoing commercial operations, research operations, field-trial operations, and personnel in California.

14. Plaintiff's claims arise out of and relate to those contacts, including the distribution and sale in California of the ABPs Plaintiff used in Los Angeles County. Syngenta AG's contacts with California are continuous, systematic, purposeful, and substantially connected to Plaintiff's claims. The exercise of jurisdiction over Syngenta AG in this action comports with traditional notions of fair play and substantial justice. Moreover, Syngenta AG caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

15. The burden on Defendants of defending in this judicial district is modest: Defendants are commercial enterprises that have sold their products into California for years, have invoked the benefits and protections of California law in doing so, and have registered their products with California regulators.

16. Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## PARTIES

### I. Plaintiff

17. Plaintiff Apostolos Panayiotou is an individual over the age of eighteen and a resident and citizen of the State of California.

18. For approximately three decades, Plaintiff regularly mixed, loaded,

sprayed, and applied ABPs in Los Angeles County, California. The ABPs used by Plaintiff were designed, manufactured, marketed, distributed, and sold by Defendants. To be clear, Plaintiff was not just exposed to the isolated atrazine chemical—often the only component of the formulated product studied in animal bioassays. Rather, Plaintiff was exposed to formulated ABPs that, in addition to the active atrazine compound, contain a cocktail of chemicals, some of which, upon information and belief, further contribute to the absorption and/or carcinogenic potential of the ABPs to which Plaintiff was exposed.

19. As a direct and proximate result of his exposure to carcinogenic ABPs designed, manufactured, marketed, distributed, and sold by Defendants, Plaintiff was diagnosed with NHL and related *sequalae*. Plaintiff has suffered and continues to suffer severe personal injury, physical pain, mental anguish, disability, disfigurement, loss of enjoyment of life, medical and related expenses, and loss of earnings and earning capacity.

## II. The Syngenta Defendants

20. Atrazine was discovered, developed, patented, and first commercialized by the Swiss chemical company J.R. Geigy Ltd. and its affiliates in the late 1950s. Geigy first introduced atrazine into the United States market in or about 1958 or 1959, principally under the trade name AAtrex.

21. Through a series of mergers, acquisitions, reorganizations, and transfers of assets and product lines, the atrazine business of J.R. Geigy Ltd. passed successively to Ciba-Geigy Ltd. and its affiliates (following the 1970 merger of J.R. Geigy Ltd. and CIBA Ltd.); to Novartis AG and its agribusiness affiliates (following the 1996 merger of Ciba-Geigy and Sandoz); and, in or about November 2000, to Defendant Syngenta AG, which was formed by the combination of the Novartis agribusiness division and the agrochemicals business of AstraZeneca PLC.

22. Defendants Syngenta AG and Syngenta Crop Protection, LLC are the successors in interest to J.R. Geigy Ltd., Ciba-Geigy Ltd., Ciba-Geigy Corporation,

Novartis AG, Novartis Crop Protection, Inc., and their respective affiliates, with respect to the design, development, testing, registration, manufacture, formulation, marketing, distribution, and sale of atrazine and ABPs. This Complaint therefore ascribes to "Syngenta" the acts, omissions, knowledge, and conduct of those predecessor and affiliated entities, as well as of any other entity to which Syngenta is a successor with respect to ABPs.

23. Upon information and belief, Plaintiff alleges that Defendants Syngenta AG and Syngenta Crop Protection, LLC, and each of them, expressly or impliedly assumed the liabilities of their predecessors with respect to ABPs; that the transactions by which they acquired the ABP business amounted to consolidations or mergers; that they are mere continuations of their predecessors with respect to the atrazine product line; that they continued the ABP product line substantially unchanged, including its trade names, registrations, formulations, marketing, and customer base; that they hold themselves out to the public and to regulators as the responsible successor to that product line; that they enjoy the goodwill attached to it; and that they are in a position to assume the risk-spreading role of their predecessors. Defendants are therefore liable for the acts and omissions of those predecessors as alleged in this Complaint.

24. Defendant Syngenta AG is a corporation organized under the laws of Switzerland with its principal place of business and global headquarters in Rosentalstrasse 67, 4058 Basel, Switzerland. At all relevant times, Syngenta AG directed, controlled, coordinated, approved, and ratified the worldwide design, development, testing, research, registration strategy, safety evaluation, regulatory advocacy, product stewardship, marketing strategy, and public communications concerning atrazine and ABPs, including those directed throughout the United States, including in California and in Los Angeles County.

25. Defendant Syngenta Crop Protection, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place

of business at 410 S. Swing Road, Greensboro, North Carolina 27409. Its members and their citizenship are identified in the jurisdictional allegations above. It is, directly or indirectly, a wholly owned subsidiary of Syngenta AG. At all relevant times, Syngenta Crop Protection, LLC (including under its predecessor names and corporate forms, among them Syngenta Crop Protection, Inc., Novartis Crop Protection, Inc., and Ciba-Geigy Corporation) held or controlled the United States federal registrations for ABPs, and manufactured, formulated, packaged, registered, marketed, promoted, distributed, sold, and provided technical support and stewardship materials for ABPs throughout the United States, including in California and in Los Angeles County.

26. Syngenta AG and Syngenta Crop Protection, LLC are referred to collectively in this Complaint as "Syngenta." Upon information and belief, Plaintiff alleges that at all relevant times each of these entities acted as the agent, servant, employee, alter ego, partner, joint venturer, and/or co-conspirator of the other with respect to the conduct alleged in this Complaint, and that each acted within the course and scope of that relationship with the knowledge, consent, authorization, and ratification of the other.

27. Upon information and belief, Plaintiff alleges that Syngenta AG so dominated and controlled the ABP-related activities of Syngenta Crop Protection, LLC—including its research agenda, its safety and toxicology program, its regulatory submissions and advocacy, its product-stewardship content, and its public statements about atrazine's health effects—that a unity of interest and ownership exists between them such that the separateness of the two entities has ceased with respect to the conduct alleged herein, and that adherence to the fiction of separate corporate existence would sanction a fraud and promote injustice.

**III. Doe Defendants**

28. The true names and capacities, whether individual, corporate, associate, partnership, governmental, or otherwise, of Defendants DOES 1 through 10,

inclusive, are unknown to Plaintiff at this time, and Plaintiff therefore sues those Defendants by such fictitious names. Plaintiff is informed and believes, and on that basis alleges, that each fictitiously named Defendant is in some manner responsible for the events, acts, omissions, injuries, and damages alleged in this Complaint, and that Plaintiff's injuries were proximately caused by their conduct. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of the DOE Defendants when they are ascertained.

29. Upon information and belief, Plaintiff alleges that at all relevant times each of the Defendants, including the DOE Defendants, was the agent, servant, employee, representative, partner, joint venturer, alter ego, successor in interest, and/or co-conspirator of each of the remaining Defendants, and that in doing the acts and omissions alleged herein each was acting within the course, scope, and authority of that relationship, with the knowledge, permission, consent, authorization, and ratification of the other Defendants.

30. Upon information and belief, Plaintiff alleges that at all relevant times Defendants and DOES 1 through 10, inclusive, and each of them, were engaged in the business of researching, developing, designing, testing, registering, licensing, manufacturing, formulating, packaging, labeling, distributing, supplying, marketing, promoting, warranting, selling, and/or otherwise introducing ABPs into the stream of commerce in the United States, in the State of California, and in Los Angeles County.

## DELAYED DISCOVERY AND FRAUDULENT CONCEALMENT

31. NHL is a disease of long latency. It does not manifest immediately at the time of exposure; it develops over years or decades.

32. Plaintiff has suffered an illness that has a latency period and does not arise until years after exposure. Pursuant to California Code of Civil Procedure section 340.8, this action is timely because it was commenced within two years after Plaintiff became aware, or reasonable should have become aware, of his injury, its

physical cause, and sufficient facts to place a reasonable person on inquiry notice that the injury was caused or contributed by another's wrongful conduct. Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to ABP until made aware that Plaintiff's NHL could be caused by use and/or exposure to ABP. The discovery rule applies, and the statute of limitations was tolled until the day Plaintiff knew or had reason to know that Plaintiff's illnesses, including NHL, were linked to Plaintiff's use and/or exposure to ABP.

33. Plaintiff could not have discovered through the exercise of reasonable diligence that exposure to ABPs is injurious to human health.

34. Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to ABP nor would a reasonable and diligent investigation by Plaintiff have disclosed that ABP would cause Plaintiff's illness.

35. The expiration of any applicable statute of limitations has been equitably tolled by reason of Syngenta's fraudulent misrepresentations and fraudulent concealment and fraudulent conduct. Through affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with use of and/or exposure to ABP.

36. As a result of Defendants' actions, Plaintiff could not reasonably have known or learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

37. Defendants had a duty to disclose material facts concerning the risks of ABPs that were within their superior knowledge, including the internal research and data described above. Plaintiff alleges that Defendants' concealment prevented him from discovering the basis for this action earlier, as described in the preceding allegations.

38. Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendants' representations.

## FACTUAL ALLEGATIONS

### I. Atrazine Is a Synthetic Chemical Designed to Kill Organic Systems

39. Atrazine is a synthetic chlorinated triazine compound, and the active chemical in ABPs. It does not occur in nature. It was created in a laboratory for the purpose of killing living organisms.

40. Atrazine kills plants by binding to the D1 protein of photosystem II and blocking photosynthetic electron transport. That blockade does not merely stop photosynthesis; it causes the plant to generate reactive oxygen species and triplet chlorophyll, which in turn produce oxidative damage to lipids, proteins, and nucleic acids. The treated plant dies of oxidative injury.

41. Atrazine is a systemic herbicide. It is absorbed through roots and foliage, is translocated throughout the plant, and is persistent: ABPs resist rapid breakdown in soil and water, and they can remain biologically active in the environment for months to years.

42. Atrazine is also soluble and mobile. It leaches readily through soil into groundwater and runs off into surface water. This combination of persistence and mobility is the reason ABPs have become the most commonly detected pesticides in the waters of the United States.

43. ABPs are readily absorbed by the human body. They enter through the skin, through inhalation of spray droplets and vapor, and through ingestion. Atrazine and its metabolites—including atrazine mercapturate, desethylatrazine, desisopropylatrazine, and diaminochlorotriazine—have been repeatedly measured in

the urine of applicators and their family members, and in the urine of members of the general population in national biomonitoring surveys. Detection of these metabolites in urine establishes systemic absorption: the chemical entered the bloodstream and was processed by the body. Moreover, surfactants and other compounds in the formulated ABP products contribute to their absorption by the human body.

## II. The Business of ABPs

44. Atrazine was developed by J.R. Geigy Ltd. in Switzerland in the 1950s. Geigy patented atrazine and its use as a herbicide and introduced it to the U.S. market at the end of the 1950's under the trade name AAtrex.

45. Atrazine was a commercial success. It was inexpensive, effective against a broad spectrum of broadleaf and grassy weeds, and selective for corn—meaning it killed the weeds without harming the crop. As a result, atrazine quickly became a foundational product of U.S. row-crop agriculture.

46. Over the last six decades, ABPs have been one of the most heavily applied herbicides in the U.S. by volume. Estimates of annual domestic use range from approximately 70 to 80 million pounds of the active ingredient atrazine. ABPs are applied to the majority of U.S. corn acreage and are also registered and applied on sorghum, sugarcane, certain turf and sod, conifer plantations, and rights-of-way.

47. ABPs have generated hundreds of millions of dollars in annual revenue for Syngenta and its predecessors and have been a cornerstone of Syngenta's dominance in the North American crop-protection market. Syngenta's commercial dependence on ABPs fuels a powerful financial incentive to defend the product—and a contrasting financial disincentive to generate, publicize, or acknowledge evidence that ABPs can cause cancer in people who handle the products.

## III. The Regulatory History of ABPs

48. The manufacture, distribution, sale, and use of pesticides in the U.S. are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"),

7 U.S.C. § 136 *et seq*. FIFRA requires that pesticides be registered with the EPA prior to distribution, sale, or use, except as provided by the Act. 7 U.S.C. § 136a(a).

49. EPA registration is not, and has never been, a determination that a pesticide is safe. The finding EPA must make in registering or reregistering a pesticide is that its use in accordance with widespread and commonly recognized practice "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D). FIFRA in turn defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). Registration is thus the result of a cost-benefit balancing exercise, not a finding that a chemical does not cause cancer.

50. Under FIFRA, it is the registrant—Syngenta—that generates and submits much of the health and safety data supporting registration. EPA reviews those submission and other available scientific information. Syngenta therefore occupied a position of superior knowledge concerning its own internal research, testing, and exposure data.

51. ABPs have been continuously registered in the United States since the 1950s. The product's regulatory history is checkered with concerns about its safety:

a. In or about 1990, EPA classified ABPs as a Restricted Use Pesticide because of its demonstrated propensity to contaminate groundwater. Restricted Use classification limits purchase and application to certified applicators and persons working under their direct supervision, and it channels safety information to end users through certification, training, and stewardship programs administered and supplied in substantial part by the registrant.

b. In 1991, EPA established a maximum contaminant level for atrazine in public drinking water of 3 parts per billion, reflecting an official

judgment that atrazine in drinking water above that concentration presents a health concern.

c. In November 1994, EPA initiated a Special Review of the triazine herbicides — atrazine, simazine, and cyanazine—based on concerns that included the herbicides' potential carcinogenicity and their contamination of drinking water sources.

d. In 2000, EPA revised its cancer classification for ABPs to "not likely to be carcinogenic to humans." That revision rested on a conclusion about the mechanism by which atrazine produced mammary gland tumors in Sprague-Dawley rats—specifically, that the neuroendocrine mechanism involved was not relevant to humans. It did not rest on, and did not purport to resolve, the human epidemiologic evidence concerning the formulated ABPs and NHL.

e. In January 2003, EPA issued an Interim Reregistration Eligibility Decision for ABPs, imposing water-monitoring and mitigation requirements on the registrant while permitting continued use.

f. In 2016, EPA released a refined ecological risk assessment concluding that atrazine exceeded levels of concern for aquatic and terrestrial organisms across broad areas of the United States.

g. In 2020, EPA issued an Interim Registration Review Decision for ABPs, again permitting continued use subject to mitigation measures, and again without resolving the human lymphoma question.

52. The EPA is an outlier. By Commission Decision 2004/248/EC of March 10, 2004, the European Commission declined to include atrazine in Annex I to Council Directive 91/414/EEC and directed Member States to withdraw authorizations for plant protection products containing atrazine. The Decision required withdrawal of authorizations, subject to transitional provisions, because the available information did not establish that atrazine and its breakdown products

would remain below the applicable groundwater limits. Atrazine-containing plant protection products are no longer authorized in the European Union.

53. ABPs are likewise not authorized for general agricultural use in Switzerland, the country in which Syngenta AG is headquartered and in which atrazine was invented. Syngenta manufactures and sells for use in American fields, and in California, a chemical that is not permitted in the fields outside its own headquarters.

54. Furthermore, in addition to the EU, ABPs have been banned and/or phased out in more than 60 countries worldwide, including nations in Africa and the Middle East, with the number of countries to ban the products continuously growing.

55. California has separately recognized atrazine as a chemical of concern. The California Department of Pesticide Regulation has designated atrazine as a groundwater contaminant and has placed it on California's Groundwater Protection List, subjecting its use to additional restriction, and monitoring. Moreover, the California EPA classifies atrazine as a reproductive and developmental toxicant.

## IV. The Science of ABP Carcinogenicity

### A. Background

56. At all relevant times, Syngenta held itself out as—and was—an expert in the toxicology of atrazine. Syngenta possesses the world's most complete body of data on the chemical: its own internal toxicology studies, its own metabolism and residue studies, its own field-exposure and biomonitoring studies, the global regulatory record, and the full published scientific literature. As the designer and manufacturer of ABPs, Syngenta is charged with the knowledge of an expert in the field.

57. Animal bioassays conducted and submitted by Syngenta's predecessors demonstrated increased incidence and earlier onset of mammary gland tumors in exposed animals. Those findings were the basis of EPA's original classification of

atrazine as a possible human carcinogen.

58. In 1985, EPA documented that Ciba-Geigy had commissioned an atrazine cancer study after an earlier study suggested an oncogenic response. A May 9, 1985 EPA memorandum concerning Toxigenics Study 4101102 states that an earlier study by the lab Industrial Bio-Test Laboratories ("IBT") had suggested an oncogenic response to the registrant. Because that study's validity was questioned, Ciba-Geigy commissioned another study. The newer study's results showed increased mammary adenocarcinomas and fibroadenomas in female rats.

59. In a June 3, 1986 letter to EPA, Ciba-Geigy regulatory specialist Thomas J. Parshley expressly referred to the "findings of mammary tumors" in an atrazine rat study recently submitted to EPA. He recognized that another ongoing study could be significant to EPA's deliberations because of those findings. Thus, by June 1986, Ciba-Geigy's regulatory personnel expressly acknowledged mammary tumor findings in an atrazine rat study and recognized their significance to EPA's evaluation of the chemical.

60. EPA's July 14, 1987 memorandum describes a May 5, 1987 letter to Dr. Robert Hess, Ciba-Geigy, Basel, reporting preliminary results from rats exposed to technical atrazine supplied by Ciba-Geigy. In female rats, leukemia/lymphoma occurred in 12/44 controls, 16/52 low-dose animals, and 22/51 high-dose animals, with a statistically significant dose-related trend. Increased uterine adenocarcinomas were also reported. The investigator characterized atrazine as carcinogenic under experimental conditions.

61. A January 4, 1999 EPA memorandum identifies Novartis Crop Protection as the registrant submitting a two-year rat oncogenicity study, MRID 44544701. EPA reported increased mammary tumor incidence at concentrations as low as 50 ppm, corresponding to 3.1 mg/kg/day, based on combined fibroadenomas, carcinomas, and adenomas. It also reported decreased time to tumor formation. The same review found no mammary tumors in ovariectomized animals and interpreted

the results as supporting an indirect, hormonally mediated mechanism.

62. EPA's July 17, 2003 Scientific Advisory Panel materials discuss a study of workers at Syngenta's St. Gabriel, Louisiana atrazine manufacturing plant. The study reported elevated prostate cancer incidence. Among workers younger than 50, five observed cases yielded an incidence 6.7 times the Louisiana comparison population, with a 95% confidence interval of 2.2–15.7.

63. Atrazine is an endocrine-disrupting chemical. Peer-reviewed research has demonstrated that atrazine induces aromatase, alters steroid hormone synthesis and signaling, and disrupts reproductive development in vertebrates at low, environmentally relevant concentrations.[1]

64. Significantly, atrazine is immunotoxic. Published, peer-reviewed research has demonstrated that atrazine suppresses and dysregulates immune function in mammals and in human cells, including by:

a. Suppressing natural killer cell cytotoxicity in human cells.[2]
b. Impairing cell-mediated immunity and decreasing host resistance to tumor challenge in rodents.[3]
c. Altering the phenotypic and functional maturation of dendritic cells.[4]
d. Producing immunosuppression following short-term exposure in mice.[5]

---

[1] Hayes, T.B., et al., "Hermaphroditic, demasculinized frogs after exposure to the herbicide atrazine at low ecologically relevant doses," *Proceedings of the National Academy of Sciences*, vol. 99, pp. 5476–5480 (2002); Hayes, T.B., et al., "Atrazine induces complete feminization and chemical castration in male African clawed frogs (Xenopus laevis)," *Proceedings of the National Academy of Sciences*, vol. 107, pp. 4612–4617 (2010).

[2] Whalen, M.M., et al., "Immunomodulation of human natural killer cell cytotoxic function by triazine and carbamate pesticides," *Chemico-Biological Interactions*, vol. 145, pp. 311–319 (2003).

[3] Karrow, N.A., et al., "Oral exposure to atrazine modulates cell-mediated immune function and decreases host resistance to the B16F10 tumor model in female B6C3F1 mice," Toxicology, vol. 209, pp. 15–28 (2005).

[4] Pinchuk, L.M., et al., "In vitro atrazine exposure affects the phenotypic and functional maturation of dendritic cells," *Toxicology and Applied Pharmacology*, vol. 223, pp. 206–217 (2007).

[5] Filipov, N.M., et al., "Immunotoxic effects of short-term atrazine exposure in young male C57BL/6 mice," *Toxicological Sciences*, vol. 86, pp. 324–332 (2005).

e. Producing developmental immunotoxicity in rodents.[6]

65. The significance of ABP immunotoxicity cannot be overstated. NHL is a cancer of the lymphocytes—the cells of the immune system. A chemical that suppresses natural killer cell function, impairs cell-mediated immunity, and reduces host resistance to tumor challenge is a chemical that operates on precisely the biological pathway by which NHL arises.

66. ABPs are also genotoxic. Studies document DNA strand breaks, micronucleus formation, chromosomal aberrations, and oxidative DNA damage in mammalian cells exposed to atrazine and to formulated atrazine products—including in human lymphocytes, the very cells from which NHL arises.[7]

67. Atrazine can additionally undergo nitrosation under the acidic conditions of the mammalian stomach to form N-nitrosoatrazine, a nitrosamine derivative reported in the published literature to be mutagenic. Syngenta and its predecessors have long been aware of the potential for in vivo formation of N-nitrosoatrazine and of the mutagenic potential of that derivative.

68. Formulated ABPs are not merely atrazine. They contain surfactants, solvents, emulsifiers, carriers, and other so-called "inert" ingredients that increase dermal penetration, increase respirable fraction, and increase bioavailability. Syngenta's toxicology submissions to regulators have focused overwhelmingly on the technical active ingredient rather than on the formulated products to which end users such as Plaintiff are actually exposed. Syngenta has never adequately tested the chronic human health effects of the formulated ABPs as they are actually mixed, loaded, and sprayed in the field.

---

[6] Rowe, A.M., et al., "Immunomodulatory effects of maternal atrazine exposure on male Balb/c mice," *Toxicology and Applied Pharmacology*, vol. 214, pp. 69–77 (2006); Rowe, A.M., et al., "Developmental immunotoxicity of atrazine in rodents," *Basic & Clinical Pharmacology & Toxicology*, vol. 102, pp. 139–145 (2008).

[7] Zeljezic, D., et al., "Evaluation of DNA damage induced by atrazine and atrazine-based herbicide in human lymphocytes in vitro using a comet and DNA diffusion assay," *Toxicology in Vitro*, vol. 20, pp. 923–935 (2006).

## B. Epidemiological Data Demonstrates that Exposure to ABPs Can Cause NHL

69. Epidemiological studies documenting the cancer risk associated with ABPs date to at least the 1980s. A series of population-based case-control studies funded by the National Cancer Institute ("NCI") examined agricultural pesticide exposures and NHL among men in the American Midwest. Those studies—conducted in Kansas, in Nebraska, and in Iowa and Minnesota—form the foundation of the modern epidemiology of agricultural NHL.[8]

70. In the Iowa and Minnesota study, Cantor and colleagues reported elevated odds ratios for NHL among men who handled triazine herbicides, including atrazine.[9] Related work in eastern Nebraska likewise identified agricultural herbicide use as a risk factor for the disease.[10]

71. In 1993, Zahm and colleagues published an analysis specifically studying atrazine, pooling large data from the Nebraska, Iowa/Minnesota, and Kansas studies.[11] That analysis reported elevated odds ratios for non-Hodgkin's lymphoma among men who used atrazine in each of the three study populations.

72. Subsequent work further supported the causal signal. In 2001, Schroeder and colleagues analyzed NHL by molecular subtype and reported that ABP use was associated with t(14;18)-positive NHL—the subtype defined by the chromosomal translocation that deregulates BCL-2 and blocks programmed cell death in B lymphocytes.[12] Subtype-specific associations of this kind are of

---

[8] Hoar, S.K., et al., "Agricultural herbicide use and risk of lymphoma and soft-tissue sarcoma," *Journal of the American Medical Association*, vol. 256, pp. 1141–1147 (1986).

[9] Cantor, K.P., et al., "Pesticides and other agricultural risk factors for non-Hodgkin's lymphoma among men in Iowa and Minnesota," *Cancer Research*, vol. 52, pp. 2447–2455 (1992).

[10] Weisenburger, D.D., "Environmental epidemiology of non-Hodgkin's lymphoma in eastern Nebraska," *American Journal of Industrial Medicine*, vol. 18, pp. 303–305 (1990).

[11] Zahm, S.H., et al., "Role of the herbicide atrazine in the development of non-Hodgkin's lymphoma," *Scandinavian Journal of Work, Environment & Health*, vol. 19, pp. 108–114 (1993).

[12] Schroeder, J.C., et al., "Agricultural risk factors for t(14;18) subtypes of non-Hodgkin's lymphoma," Epidemiology, vol. 12, pp. 701–709 (2001).

particular scientific importance because NHL is comprised of multiple cancers, and pooling biologically distinct subtypes can obscure causal signals.

73. In 2003, De Roos and colleagues published an integrative pooled analysis of the three National Cancer Institute case-control studies, evaluating forty-seven pesticides.[13] ABP was among the pesticides for which that analysis reported a positive association with NHL.

74. In 2006, Chiu and colleagues published a Nebraska-based case control study that reported positive associations between exposure to ABPs and NHL.[14]

75. In 2014, Schinasi and Leon published a systematic review and meta-analysis of the world literature on occupational pesticide exposure and NHL, generating summary risk estimates by chemical group and by active ingredient.[15] That review reported positive summary associations between NHL and exposure to the triazine herbicide chemical group, of which atrazine is the dominant member.

76. In 2019, the AGRICOH consortium published a pooled analysis of three large agricultural cohorts in France, Norway, and the United States, examining pesticide use and risk of non-Hodgkin lymphoid malignancies, including by histologic subtype.[16] The study reported associations between individual active ingredients—including triazine herbicides—and lymphoid malignancy.

77. Studies within the Agricultural Health Study ("AHS"), an ongoing prospective cohort of licensed pesticide applicators in Iowa and North Carolina,

---

[13] De Roos, A.J., et al., "Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men," *Occupational and Environmental Medicine*, vol. 60, e11 (2003).

[14] Chiu, B., et al. "Agricultural pesticide use and risk of t(14;18)-defined subtypes of non-Hodgkin lymphoma", *Blood*, vol. 108 (2006).

[15] Schinasi, L., and Leon, M.E., "Non-Hodgkin lymphoma and occupational exposure to agricultural pesticide chemical groups and active ingredients: a systematic review and meta-analysis," *International Journal of Environmental Research and Public Health*, vol. 11, pp. 4449–4527 (2014).

[16] Leon, M.E., et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA: a pooled analysis from the AGRICOH consortium," *International Journal of Epidemiology*, vol. 48, pp. 1519–1535 (2019).

have reported elevated risks for certain cancers in some atrazine exposure categories.[17]

78. Taken together, the published literature supports Plaintiff's allegation of a causal relationship between exposure to ABPs and NHL, supported by molecular-subtype specificity, by pooled and meta-analytic summary estimates, and by a coherent and well-characterized immunotoxic and genotoxic mechanism of action.

**C. The World Health Organization Classifies Atrazine as a Carcinogen**

79. The preceding discussion of the scientific data supporting the carcinogenicity of ABPs is aptly summarized and underscored by the November 21, 2025 classification by the World Health Organization's preeminent cancer research branch—the International Agency for Research on Cancer ("IARC")—of atrazine as a "probably carcinogenic to humans."[18]

80. IARC's world-renowned classification process was, in the case of ABPs, supported by a wealth of epidemiological, toxicological, and mechanistic data.

81. The IARC Working Group's evaluation of atrazine identified "limited" evidence of cancer in humans (meaning a positive association between exposure to an agent and cancer where a causal interpretation is credible); "sufficient" evidence in experimental animals (meaning an increased incidence of malignant tumors or a combination of benign and malignant tumors found in two or more independent studies or in both sexes of a single species in a well-conducted, high-quality study); and "strong" mechanistic evidence in experimental systems (meaning a robust,

---

[17] Rusiecki, J.A., et al., "Cancer incidence among pesticide applicators exposed to atrazine in the Agricultural Health Study," *Journal of the National Cancer Institute*, vol. 96, pp. 1375–1382 (2004); Freeman, L.E.B., et al., "Atrazine and cancer incidence among pesticide applicators in the Agricultural Health Study (1994–2007)," *Environmental Health Perspectives*, vol. 119, pp. 1253–1259 (2011).

[18] https://www.iarc.who.int/news-events/iarc-monographs-evaluation-of-the-carcinogenicity-of-atrazine-alachlor-and-vinclozolin/.

consistent, and coherent laboratory data showing that an agent exhibits one or more of the internationally recognized Key Characteristics of Carcinogens in non-human mammalian systems, human primary cells, or cellular assays). In humans, IARC identified positive associations with non-Hodgkin lymphoma that is positive for the chromosomal translocation t(14;18). These findings support Plaintiff's allegations concerning the cancer-causing potential of atrazine; Plaintiff further alleges that his exposure to Defendants' formulated ABPs was a substantial factor in causing his NHL.

82. Instead of meaningfully engaging with the IARC classification and taking efforts to protect consumers from its cancer-causing product, Syngenta lashed out at IARC. The company's statement on IARC's classification attempts to discredit, undermine, and wave away IARC's scientific process generally and its classification of atrazine specifically.

**V. Syngenta Suppressed, Distorted and Attacked the Science**

83. Rather than investigate the NHL signal in the published literature, Syngenta undertook a sustained campaign to control the scientific and public narrative concerning ABPs.

84. Upon information and belief, Syngenta has never conducted or commissioned an epidemiologic study of ABP end users—the farmers, applicators, landscapers, groundskeepers, and home users who actually mix and spray the product—to determine whether they develop NHL at elevated rates. At all relevant times, Syngenta possessed the financial resources, the technical capacity, the customer data, and the scientific personnel to conduct such a study. It elected not to.

85. Syngenta has never conducted long-term immunotoxicity testing of formulated ABPs sufficient to characterize the risk of lymphohematopoietic malignancy in exposed end users, despite possessing the capacity and resources to do so, and despite the publication of research demonstrating the immunosuppressive effects of ABPs.

86. In or about 1997, Syngenta's corporate predecessor retained an outside panel of scientists, operating under the name Ecorisk, to evaluate atrazine's ecological effects. Among the scientists engaged through that panel was Dr. Tyrone Hayes, a developmental endocrinologist at the University of California, Berkeley, who was asked to study atrazine's effects on amphibians.

87. Dr. Hayes found that atrazine produced gonadal abnormalities in frogs at concentrations as low as 0.1 part per billion—a concentration thirty times below the federal drinking water standard. When Dr. Hayes sought to publish and further pursue those findings, the panel and its corporate sponsor resisted. Dr. Hayes resigned from the panel in or about 2000 and published his findings independently in 2002.

88. Documents produced and unsealed in the ABP water-contamination litigation, and subsequently reported in the national press, revealed that Syngenta thereafter developed and pursued a coordinated plan to discredit Dr. Hayes personally and professionally. That plan included, among other measures, proposals to investigate Dr. Hayes's personal life and finances, to monitor and shadow his public appearances, to communicate with his employer, to solicit third-party scientists to criticize him, and to purchase his name as an internet search term so that Syngenta's materials would appear when the public searched for his research.

89. Syngenta's gangster tactics did not end with Dr. Hayes. Upon information and belief, Syngenta has hired detective agencies to investigate and harass members of an EPA Scientific Advisory Group that was examining atrazine.

90. The same public record revealed Syngenta's broader program of managing third-party scientific and public opinion. Syngenta funded, organized, and directed purportedly independent grower and "ally" organizations, including the Triazine Network, to advocate for ABPs before regulators and in the press. Syngenta retained public relations firms to seed favorable commentary. And Syngenta paid outside academics to produce analyses favorable to ABPs—including

an economist retained to quantify the purported economic benefits of ABPs—without consistently disclosing the financial relationship when those analyses were presented as independent scholarship.

91. Indeed, Syngenta maintained a roster of over 130 experts, academics, and commentators (such as writer Steven Milloy) deployed to downplay health and environmental risks and argue for the economic necessity of ABPs without disclosing their financial ties to Syngenta. Documents show people on the list were coached, their statements in support of ABPs were edited by the company and payments to them were not publicly disclosed. In some cases, Syngenta or its PR team wrote the Op-Ed pieces and then scanned its stakeholder database for a signer.

92. Syngenta additionally maintained and promoted websites and public-facing materials asserting that ABPs are safe and that the scientific evidence does not support a link between ABPs and human cancer, while in possession of the contrary evidence described in this Complaint.

93. The purpose and effect of this campaign was to ensure that end users like Plaintiff —and the physicians who treated them—would never learn that handling ABPs could cause NHL.

94. Furthermore, in 2016, Syngenta was fined over a million dollars by the EPA for selling misbranded ABPs and failing to keep study records.[19]

95. For three years, Syngenta sold mislabeled pesticides and herbicides to consumers and farming supply stores hundreds of times in at least six states—even while the company was paying fines for previous similar environmental violations.

96. Syngenta was fined more than $1.2 million by the EPA for selling pesticides that were misbranded, had outdated labels and for failing to maintain records related to pesticide studies, as required by the federal government.

[19] https://ncnewsline.com/2016/09/19/epa-fines-syngenta-1-2-million-for-selling-misbranded-pesticides-failing-to-keep-study-records/

97. According to a consent agreement signed by the company, Syngenta allegedly sold and distributed pesticides whose labels were outdated by as many as nine years. In Iowa, Michigan, Kansas and Missouri, vital label information was missing: precautionary statements and directions for use, storage and disposal. The affected pesticides included Expert—an ABP—which is classified as a restricted use chemical because of its toxicity.

98. Syngenta also allegedly failed to maintain records or raw data on required EPA pesticide/fungicide studies at two contracted laboratories.

99. And finally, Syngenta sold 19 pesticides to 222 re-fillers without proper records or repackaging requirements. Registered re-fillers, such as agricultural supply stores, can repackage pesticides in refillable containers. The pesticide must be labeled without any changes, except for the re-filler's EPA tracking number.

100. More than $766,000 was levied in civil penalties, with another $437,000 for a four-year Supplemental Environmental Project—essentially, an employee retraining program.

101. Moreover, Syngenta has been penalized for similar violations over the past 20 years. In 2012, the company paid $102,000 in penalties for selling and distributing mislabeled pesticides. In 2010, Syngenta was fined again—$9,000—for the same reason.

102. And in 2006, the EPA fined Syngenta Seeds $1.5 million for selling and distributing seed corn that contained an unregistered genetically engineered pesticide.

103. In 2008, the company was fined $284,000 for several violations, including worker protections at its research facility in Hawaii.

## VI. Defendants Never Warned Outside the Label, Though Nothing Prevented Such a Warning

104. EPA regulates pesticide "labeling" as that term is defined in 7 U.S.C. § 136(p), and certain claims made in connection with a pesticide's distribution or sale. EPA does not approve, regulate, require, or restrict the content of a manufacturer's advertising, its marketing materials, the oral statements of its sales representatives and technical-service personnel, its product-stewardship programs, its applicator-training and certification materials, its grower bulletins, its websites, or its communications with retailers and distributors.

105. Certification, recertification, and continuing-education programs, together with registrant-supplied stewardship materials, are a primary channel through which end users receive safety information about the products they handle. Syngenta supplied content to and participated in those channels. Syngenta knew that end users were expected and directed to rely on them.

106. Syngenta never used any of these channels to disclose that exposure to ABPs was associated with an increased risk of NHL. To the extent Syngenta's non-label communications addressed ABP safety at all, they affirmatively minimized and denied the risk.

107. Syngenta's advertising and promotional materials for ABPs depicted and described routine mixing, loading, and application without conveying that the chemical being handled was associated with lymphoma, and without conveying the precautions that such an association would warrant.

108. Nothing in FIFRA, in any EPA regulation, in any registration condition, or in any provision of California law prevented Syngenta from disclosing, through these non-label channels, what it knew and what was knowable about ABPs and NHL.

## VII. Safer Alternative Designs Were Available Throughout the Relevant Period

109. At all relevant times, there existed practical, technically feasible, and economically viable alternatives to the design and formulation of ABPs that would have reduced or eliminated the risk of NHL without substantially impairing the product's utility as a herbicide, including:

a. Alternative herbicide active ingredients registered and commercially available for the same use patterns and the same target weeds, which did not carry ABPs' immunotoxic and genotoxic profile;
b. Reformulation to eliminate or replace surfactants, solvents, and other adjuvant ingredients that increase dermal absorption, respirable fraction, and systemic bioavailability of atrazine in the formulated product.
c. Reformulation into encapsulated, granular, or low-dust delivery systems that materially reduce applicator contact and inhalation exposure during mixing and loading.
d. Physical container and transfer-system designs, including water-soluble unit-dose sachets and in closed-transfer container systems that eliminate open pouring, measuring, and rinsing—the operations during which applicator exposure is greatest.
e. Reduced application rates and reduced-concentration formulations sufficient to achieve weed control at materially lower applicator exposure.
f. Integrated weed-management approaches, including mechanical and cultural controls, that Syngenta was in a position to support and promote rather than displace.

110. Syngenta adopted none of these alternatives in the products to which Plaintiff was exposed. The cost and burden of doing so were substantially outweighed by the gravity and likelihood of the harm—an incurable or life-altering disease.

## VIII. Plaintiff Asserts No Federal Claim and Seeks No Labeling Requirement

111. Every cause of action in this Complaint arises under California law. Plaintiff asserts no claims under FIFRA, under any EPA regulation, or under any other federal statute or regulation. References in this Complaint to federal statutes, regulations, agencies, and proceedings are made solely as background and context.

112. Plaintiff does not allege that the EPA-approved label or labeling of any ABP was inadequate. Plaintiff does not allege that Defendants should have added any statement to, or altered any statement on, any EPA-approved label or labeling. Plaintiff does not seek to impose any labeling requirement in addition to or different from the requirements imposed under FIFRA. Plaintiffs' allegations concerning container and transfer-system design address physical features affecting exposure, rather than the content of labeling.

113. Plaintiff's failure-to-warn claim rests exclusively on Defendants' conduct outside the EPA-approved label and labeling—including their advertising, marketing, promotional statements, point-of-sale conduct, representations by sales and technical personnel, product-stewardship and applicator-training communications, websites, and other non-label channels, none of which constitutes "labeling" within the meaning of 7 U.S.C. § 136(p) because none accompanied the product and none was referenced on the label.

114. To the extent California law would impose on Defendants any duty exceeding that imposed by federal law, Plaintiff does not assert such a claim. The duties Plaintiff seeks to enforce run parallel to federal law: had Defendants complied with the California-law duties alleged here, they would also have complied with federal law.

## **CAUSES OF ACTION**

## COUNT I

## STRICT PRODUCTS LIABILITY — DESIGN DEFECT

115. Plaintiff incorporates by reference each preceding allegation of this Complaint as though fully set forth herein.

116. Syngenta designed, researched, developed, tested, manufactured, formulated, packaged, registered, labeled, marketed, promoted, distributed, and sold the ABPs to which Plaintiff was exposed, and placed those products into the stream of commerce.

117. The ABPs to which Plaintiff was exposed reached Plaintiff without substantial change in the condition in which Syngenta designed, manufactured, and sold them.

118. Plaintiff used and was exposed to ABPs in the manner intended by Syngenta and in a manner that was reasonably foreseeable to Syngenta.

119. Plaintiff is an ordinary consumer and end user of ABPs and is among the class of persons Syngenta intended and foresaw would purchase, handle, mix, and apply its products.

120. ABPs failed to perform as safely as an ordinary consumer would have expected when used in an intended or reasonably foreseeable manner. Specifically:

121. An ordinary end user would not have expected that mixing and spraying ABPs in accordance with the product's directions would cause cancer.

122. An ordinary end user would not have expected that ABPs would be absorbed into the body through the skin, lungs, and mucous membranes during ordinary mixing and application, and would circulate systemically.

123. An ordinary end user would not have expected that ABPs would suppress and dysregulate the immune system.

124. An ordinary end user would not have expected that repeated exposure to ABPs over years of ordinary use would cause NHL.

125. An ordinary end user would not have expected that the use of personal

protective equipment would fail to prevent systemic absorption of the product.

126. Independently, the risks inherent in the design of ABPs outweigh the benefits of that design. Applying the factors relevant to that determination:

a. The gravity of the danger posed by the design is extreme: a malignancy of the immune system that is potentially fatal and that, at a minimum, requires toxic and debilitating treatment and lifelong surveillance;

b. The likelihood that such danger would occur is substantial, given the volume of ABP applied, the number of persons who handle it, the pervasiveness of exposure, and the published epidemiology and mechanistic evidence described above.

c. Practical, technically feasible, and economically viable safer alternative designs and formulations existed throughout the relevant period, as alleged above, including alternative active ingredients, reformulation to reduce dermal and inhalation bioavailability, encapsulated and granular delivery systems, water-soluble unit-dose packaging, closed-transfer systems, and reduced application rates.

d. The mechanical and financial feasibility of adopting a safer alternative design was well within Syngenta's capabilities, and the cost of doing so was modest in relation to the revenue Syngenta derived from ABPs.

e. Adverse consequences to the product and to the consumer from an alternative design would have been minimal; the alternatives identified would not have substantially impaired the product's utility as a herbicide.

127. Syngenta could have designed and formulated ABPs to be less dangerous without substantially impairing their usefulness or unreasonably increasing their cost. Syngenta did not do so.

128. The ABPs to which Plaintiff was exposed were defective in design and unreasonably dangerous when they left Syngenta's possession and control.

129. Syngenta knew, or in light of generally recognized and prevailing scientific and medical knowledge and its own internal data should have known, of the defective and unreasonably dangerous condition of ABPs at all relevant times.

130. The defective design of ABPs was a substantial factor in causing Plaintiff's non-Hodgkin's lymphoma and the injuries and damages alleged in this Complaint.

131. Syngenta's conduct in designing, manufacturing, and selling ABPs in their defective condition, with knowledge of their dangers and with conscious disregard for the safety of the end users who would handle them, was willful, wanton, oppressive, fraudulent, and malicious, and warrants an award of exemplary damages as alleged below.

132. **WHEREFORE**, Plaintiff prays for judgment against Syngenta and DOES 1 through 10 as set forth in the Prayer for Relief below.

## COUNT II

## STRICT PRODUCTS LIABILITY — FAILURE TO WARN OUTSIDE THE LABEL

133. Plaintiff incorporates by reference each preceding allegation of this Complaint as though fully set forth herein.

134. This Count is directed solely at Defendants' conduct outside the EPA-approved label and labeling. Plaintiff does not allege in this Count that the EPA-approved label or packaging of any ABP was inadequate, and does not seek to impose any labeling or packaging requirement in addition to or different from those required under FIFRA.

135. Defendants designed, manufactured, formulated, distributed, and sold the ABPs to which Plaintiff was exposed. Each Defendant was a link in the chain of distribution that placed ABPs into Plaintiff's hands, and each is strictly liable for the defective condition of those products.

136. When Syngenta manufactured, distributed, and sold the ABPs to which

Plaintiff was exposed, the following was known to Syngenta, or knowable in light of the generally recognized and prevailing scientific and medical knowledge then available, together with Syngenta's own internal research and data:

a. ABPs were designed, formulated, and packaged such that they were likely to be absorbed through the skin, inhaled into the respiratory tract, and incidentally ingested by the persons who mixed, loaded, applied, and cleaned up after them.

b. Once absorbed, atrazine and its metabolites circulate systemically in the human body and are excreted in urine, as Syngenta's own biomonitoring and field-exposure research demonstrated.

c. Atrazine suppresses and dysregulates immune function, including natural killer cell cytotoxicity, cell-mediated immunity, and host resistance to tumor challenge.

d. Atrazine and formulated ABPs cause DNA damage and oxidative injury in mammalian and human cells, including human lymphocytes.

e. Published epidemiologic studies of agricultural workers reported positive associations between atrazine and triazine herbicide exposure and non-Hodgkin's lymphoma, including by molecular subtype.

f. Repeated exposure to ABPs over was likely to cause non-Hodgkin's lymphoma in end users.

137. The risk of contracting non-Hodgkin's lymphoma from exposure to ABPs presented a substantial danger to persons using ABPs in an intended or reasonably foreseeable manner.

138. An ordinary consumer would not have recognized that risk. Nothing about the appearance, odor, handling characteristics, or immediate physiological effects of ABPs would disclose to an ordinary end user that the product could cause a malignancy of the immune system decades later.

139. Defendants failed to adequately warn of that risk through any channel

outside the EPA-approved label and labeling. Specifically:

a. Syngenta failed to disclose the risk in its advertising, marketing, and promotional materials for ABPs.

b. Syngenta failed to disclose the risk through its sales representatives, technical-service personnel, and agronomic advisors.

c. Syngenta failed to disclose the risk in its product-stewardship materials, grower bulletins, safety communications, and applicator-training and certification content — channels that, because ABPs are Restricted Use Pesticides, Syngenta knew end users were expected and directed to rely upon for safety information.

d. Syngenta failed to disclose the risk on its websites and in its public communications, and instead affirmatively represented that ABPs do not cause cancer in humans.

e. Syngenta failed to communicate the risk to its distributors and retailers for onward communication to end users.

140. Each Defendant had ample opportunity and ample means to provide such a warning. No federal or state law prevented any Defendant from doing so.

141. As a result of the absence of any warning outside the label, the ABPs to which Plaintiff was exposed were defective and unreasonably dangerous when they left each Defendant's possession and control.

142. Had any Defendant provided an adequate warning through any of these channels, Plaintiff would have received it, would have heeded it, and would not have purchased or used ABPs. Plaintiff is entitled to the presumption that he would have heeded an adequate warning had one been given.

143. Defendants' failure to warn outside the label was a substantial factor in causing Plaintiff's non-Hodgkin's lymphoma and the injuries and damages alleged in this Complaint.

144. Syngenta's failure to warn was knowing, deliberate, and undertaken in

conscious disregard of the safety of the end users of its products, and warrants an award of exemplary damages as alleged below.

145. **WHEREFORE**, Plaintiff prays for judgment against Syngenta and DOES 1 through 10 as set forth in the Prayer for Relief below.

## COUNT III

## NEGLIGENCE

146. Plaintiff incorporates by reference each preceding allegation of this Complaint as though fully set forth herein.

147. Plaintiff does not allege in this Count that the EPA-approved label or packaging of any ABP was inadequate, and does not seek to impose any labeling requirement in addition to or different from those required under FIFRA. 7 U.S.C. § 136v(b). The negligence alleged in this Count concerns Defendants' design, formulation, research, testing, post-market surveillance, retail conduct, and non-label communications. Any reference to packaging concerns the physical container and transfer-system features alleged above, rather than the content of labeling.

148. At all relevant times, Syngenta owed a duty to exercise reasonable care for the health and safety of the persons it was reasonably foreseeable would be exposed to ABPs—including a duty to exercise reasonable care in the research, design, formulation, testing, manufacture, packaging, marketing, promotion, distribution, sale, and post-market surveillance of ABPs, and a duty to exercise reasonable care in what it said, and did not say, about the safety of ABPs outside the label.

149. Syngenta breached its duty of care. Syngenta negligently:

a. Designed and formulated ABPs such that they were likely to be absorbed through the skin, inhaled, and ingested by the persons who mixed and applied them.

b. Designed and formulated ABPs such that exposure was likely to cause immune suppression, genotoxic injury, and non-Hodgkin's lymphoma.

c. Failed to conduct adequate research and testing into the extent to which end users are actually exposed to ABPs during mixing, loading, application, and cleanup under real-world conditions.

d. Failed to conduct adequate chronic toxicity, immunotoxicity, and carcinogenicity testing of formulated ABPs—as distinct from technical atrazine alone—notwithstanding that formulated products are what end users actually handle.

e. Failed to conduct or commission any epidemiologic study of atrazine end users, despite possessing the resources, the data, and the technical capacity to do so, and despite decades of published literature reporting an association with non-Hodgkin's lymphoma.

f. Failed to conduct adequate post-market surveillance of the health outcomes of ABP end users.

g. Failed to investigate, and deliberately declined to investigate, the lymphoma signal in the published epidemiologic literature.

h. Failed to disclose, through its advertising, marketing, promotional materials, sales and technical personnel, product-stewardship and applicator-training communications, websites, and other non-label channels, that exposure to ABPs was associated with an increased risk of non-Hodgkin's lymphoma.

i. Affirmatively represented through those same non-label channels that atrazine does not cause cancer in humans, while in possession of evidence to the contrary.

j. Suppressed, discredited, and interfered with the generation and dissemination of scientific evidence concerning atrazine's health effects, including through the conduct described above.

k. Failed to warn its distributors and retailers of the risks of the products it supplied to them for resale to end users.

l. Continued to design, manufacture, market, and sell ABPs with knowledge that they were unreasonably dangerous to the persons who would handle them.

150. It was reasonably foreseeable to each Defendant that its breaches of duty would cause injury of the kind Plaintiff suffered, to a person in Plaintiff's position.

151. Each Defendant knew or should have known that end users such as Plaintiff would not appreciate the risk of exposure to ABPs and would rely on Defendants to disclose it.

152. Defendants' negligence was a substantial factor in causing Plaintiff's non-Hodgkin's lymphoma and the injuries and damages alleged in this Complaint. Absent Defendants' negligence, Plaintiff would not have developed non-Hodgkin's lymphoma.

153. Syngenta's negligent conduct was aggravated by the kind of wrongdoing for which the law permits exemplary damages, as alleged below.

154. **WHEREFORE**, Plaintiff prays for judgment against Syngenta, and DOES 1 through 10 as set forth in the Prayer for Relief below.

## EXEMPLARY DAMAGES ALLEGATIONS

155. Plaintiff incorporates by reference each preceding allegation of this Complaint as though fully set forth herein.

156. Plaintiff seeks exemplary and punitive damages against Syngenta pursuant to California Civil Code section 3294 on the ground that Syngenta is guilty of oppression, fraud, and malice.

157. Syngenta acted with malice. Syngenta engaged in despicable conduct carried on with a willful and conscious disregard of the rights and safety of Plaintiff and of the other end users of its products. Syngenta knew, over a period of decades, that published epidemiology associated its flagship product with non-Hodgkin's lymphoma; that ABPs suppress the immune system and damage human

lymphocytes; that end users absorb ABPs systemically during ordinary use; and that regulatory approval did not eliminate the contrary evidence of lymphoma risk alleged above. With that knowledge, Syngenta continued to design, manufacture, market, and sell ABPs without warning, and it did so for the purpose of protecting the revenue that ABPs generated.

158. Syngenta acted with oppression. Syngenta subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights by placing in his hands, year after year for nearly three decades, a product it knew to be associated with a potentially fatal cancer, while withholding from him the single piece of information he needed to protect himself.

159. Syngenta acted with fraud. Syngenta intentionally concealed and suppressed material facts concerning the health effects of ABPs—facts it had a duty to disclose and that were within its superior and, in material part, exclusive knowledge—with the intention of depriving Plaintiff of the ability to make an informed decision about whether to purchase, handle, and be exposed to ABPs. Syngenta further made affirmative misrepresentations, through non-label channels, that ABPs do not cause cancer in humans, knowing those representations to be unsupported and misleading, and intending that end users such as Plaintiff would rely on them.

160. Syngenta's conduct was not the product of accident, inadvertence, or excusable error. It was the product of deliberate corporate strategy, carried out over decades and across multiple corporate successors, and including:

a. The deliberate decision never to conduct an epidemiologic study of the end users of its own product, so as to avoid generating evidence adverse to ABPs.

b. The deliberate decision to fund and publicize manufacturing-worker studies that Syngenta knew were not a valid proxy for end-user

exposure, and to present them publicly and to regulators as though they were.

c. The deliberate decision to deploy regulatory cancer classifications that Syngenta knew did not address lymphoma as though they established that atrazine causes no human cancer.

d. The organized campaign to discredit scientists whose research on ABPs Syngenta itself had funded and whose findings Syngenta found commercially inconvenient—including proposals to investigate their personal life, to monitor their appearances, to contact their employers, and to purchase their name as an internet search term.

e. The funding and direction of purportedly independent third-party organizations, academics, and commentators to advocate for ABPs without consistent disclosure of Syngenta's financial sponsorship.

f. The maintenance of public-facing materials asserting ABP safety while in possession of contrary evidence.

g. The continued sale into the United States and California markets of a product barred from the European Union and from general agricultural use in Syngenta's own home country, without disclosing to American end users the health concerns underlying those actions.

161. Plaintiff is informed and believes, and on that basis alleges, that the conduct described in this Complaint was committed, authorized, directed, approved, adopted, and ratified by one or more officers, directors, and managing agents of Syngenta AG and Syngenta Crop Protection, LLC—that is, by employees who exercised substantial independent authority and judgment in corporate decision-making such that their decisions ultimately determined corporate policy. The conduct alleged was corporate policy: it was implemented across decades, across corporate successors, across regulatory jurisdictions, and through coordinated scientific, legal, regulatory, and public-relations functions of the enterprise, and

could not have occurred without the advance knowledge, authorization, and ratification of corporate leadership.

162. Plaintiff is further informed and believes, and on that basis alleges, that officers, directors, and managing agents of Syngenta had advance knowledge of the unfitness of the employees and agents who carried out the conduct alleged herein and employed them with a conscious disregard of the rights and safety of others.

163. There is no indication that Syngenta will cease the conduct alleged in this Complaint absent an award sufficient to punish it and to deter it and others from similar conduct. Syngenta continues to manufacture, market, and sell ABPs in California today, and continues to assert publicly that atrazine is safe.

164. Plaintiff is therefore entitled to an award of exemplary and punitive damages against Syngenta in an amount sufficient to punish Syngenta and to deter Syngenta and others from like conduct.

## PRAYER FOR RELIEF

165. **WHEREFORE**, Plaintiff prays for judgment against Defendants SYNGENTA AG; SYNGENTA CROP PROTECTION, LLC; and DOES 1 through 10, inclusive, and each of them, as follows:

a. For general and non-economic damages, including damages for past and future physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress, according to proof;

b. For special and economic damages, including past and future medical, hospital, pharmaceutical, rehabilitative, surveillance, and related expenses, according to proof;

c. For past and future loss of earnings, loss of earning capacity, and other economic loss, according to proof;

d. For exemplary and punitive damages according to proof;

e. For prejudgment and post-judgment interest as permitted by law;

f. For costs of suit incurred herein;

g. For attorneys' fees to the extent permitted by law; and

h. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

166. Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 6, 2026

**WISNER BAUM, LLP**

/s/ Pedram Esfandiary
Timothy A. Loranger, Esq. (SBN: 225422)
tloranger@wisnerbaum.com
Pedram Esfandiary, Esq. (SBN: 312569)
pesfandiary@wisnerbaum.com
**WISNER BAUM LLP**
11111 Santa Monica Blvd. Ste. 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Counsel for Plaintiff*